**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| JODI BASEN, derivatively on behalf of BELLRING BRANDS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>DARCY HORN DAVENPORT, ROBERT V. VITALE, THOMAS P. ERICKSON, ELLIOT H. STEIN, JR., JENNIFER KUPERMAN JOHNSON, CHONDA J. NWAMU, SHAWN W. CONWAY, and DAVID I. FINKEL-STEIN,<br><br>Defendants,<br><br>-and-<br><br>BELLRING BRANDS, INC.,<br><br>Nominal Defendant. | Case No.<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Jodi Basen ("Plaintiff"), by and through Plaintiff's undersigned attorneys, derivatively on behalf of Nominal Defendant BellRing Brands, Inc. ("BellRing" or the "Company"), brings this Verified Shareholder Derivative Complaint against Darcy Horn Davenport ("Davenport"), Robert V. Vitale ("Vitale"), Thomas P. Erickson ("Erickson"), Elliot H. Stein, Jr. ("Stein"), Jennifer Kuperman Johnson ("Johnson"), Chonda J. Nwamu ("Nwamu"), Shawn W. Conway ("Conway"), and David I. Finkelstein ("Finkelstein") (collectively, the "Individual Defendants" and, together with BellRing, "Defendants") for, among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by BellRing with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought against certain BellRing officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants from October 1, 2024 to the present (the "Relevant Period").

2. BellRing makes "convenient nutrition" products, such as protein shakes, energy bars, and protein powders. The Company's main brand is Premier Protein, which was responsible for 85.9% of BellRing's net sales in fiscal year 2025, with its ready-to-drink protein shakes making

up 81.7% of the Company's net sales in fiscal year 2025.

3. Although BellRing recognized revenue when it shipped products to retailers, it separately tracked end-user consumption, market share, competitive activity, promotional volume, and purchasing trends through Numerator, Circana, and internal information.

4. By early fiscal 2025, data showed that Premier Protein's consumption and market share were weakening as consumers shifted to competitors, while increasingly heavy promotions supported reported sales. Nevertheless, BellRing and Defendant Davenport continued to portray consumption as strong and resilient, denied any softness, minimized competitive pressures, and represented that BellRing's growth reflected durable demand.

5. The truth emerged through a series of disclosures. In August 2025, BellRing narrowed its annual sales outlook, attributed the reduction to increased competition, and acknowledged that its largest promotional period had included January and February 2025; its stock price fell nearly 33%. Further disclosures in November 2025 and February 2026 described a more competitive environment, the effect of discontinued promotions, and more frequent promotions by emerging brands, producing additional stock-price declines.

6. On May 5, 2026, BellRing disclosed that its quarterly results had fallen below expectations and that approximately 40 new competitors had entered the market over the preceding 18 months. BellRing's stock price fell nearly 39%.

7. In light of the Individual Defendants' misconduct, BellRing, Defendant Davenport, its former Chief Executive Officer, and Paul A. Rode ("Rode"), its Chief Financial Officer, were named as defendants in the federal securities class action captioned *In re BellRing Brands, Inc. Securities Litigation*, No. 1:26-cv-00575-JSR (S.D.N.Y.) (the "Securities Class Action").

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise federal questions under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder, and seek contribution pursuant to Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

9. This Court has personal jurisdiction over each Defendant because BellRing is incorporated in Delaware and each Individual Defendant, by serving as a director or officer of a Delaware corporation, has sufficient contacts with this District. This action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

10. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1391(b) and 1401 because BellRing is incorporated in this District and conducts substantial business here.

## PARTIES

11. Plaintiff is a current BellRing stockholder and has continuously held BellRing common stock at all relevant times.

12. Nominal Defendant BellRing Brands, Inc. is a Delaware corporation with principal executive offices at 1 N Brentwood Blvd., Suite 1550, St. Louis, Missouri 63105. BellRing's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BRBR."

13. Defendant Vitale has served as Chairman of BellRing's Board since September 2019. Defendant Vitale also serves as President, Chief Executive Officer, and Chairman of Post Holdings, Inc. ("Post Holdings"), BellRing's former parent company. According to the Company's

public filings, BellRing paid Defendant Vitale total compensation of $353,690 in fiscal 2023, $365,082 in fiscal 2024, and $358,750 in fiscal 2025.

14. Defendant Davenport served as BellRing's President and Chief Executive Officer ("CEO") from September 2019 until July 29, 2026 and as a director from October 2019 until July 29, 2026. According to the Company's public filings, BellRing paid Defendant Davenport total compensation of $6,801,904 in fiscal 2023, $9,901,653 in fiscal 2024, and $6,563,539 in fiscal 2025.

15. Defendant Erickson has served as a BellRing director since October 2019 and as Lead Independent Director since July 30, 2025. Defendant Erickson chairs the Audit Committee, is designated as an Audit Committee financial expert, and serves on the Corporate Governance and Compensation Committee and Executive Committee. According to the Company's public filings, BellRing paid Defendant Erickson total compensation of $291,310 in fiscal 2023, $297,250 in fiscal 2024, and $298,750 in fiscal 2025.

16. Defendant Stein has served as a BellRing director since October 2019 and is a member of the Audit Committee and Executive Committee. According to the Company's public filings, BellRing paid Defendant Stein total compensation of $271,310 in fiscal 2023, $277,250 in fiscal 2024, and $278,750 in fiscal 2025.

17. Defendant Johnson has served as a BellRing director since October 2019 and is a member of the Corporate Governance and Compensation Committee and Executive Committee. Defendant Johnson also serves on the boards of Post Holdings and Post Holdings Partnering Corporation, a special purpose acquisition company affiliated with Post Holdings. According to the Company's public filings, BellRing paid Defendant Johnson total compensation of $268,810 in fiscal 2023, $274,750 in fiscal 2024, and $276,250 in fiscal 2025.

18. Defendant Nwamu has served as a BellRing director since May 2021 and is a member of the Audit Committee. According to the Company's public filings, BellRing paid Defendant Nwamu total compensation of $258,333 in fiscal 2023, $277,250 in fiscal 2024, and $278,750 in fiscal 2025.

19. Defendant Conway has served as a BellRing director since October 2023 and chairs the Corporate Governance and Compensation Committee. According to the Company's public filings, BellRing paid Defendant Conway total compensation of $260,000 in fiscal 2024 and $283,750 in fiscal 2025.

20. Defendant Finkelstein has served as a BellRing director since January 1, 2026 and is a member of the Audit Committee.

Defendants Vitale and Davenport are referred to collectively as the "Insider Seller Defendants." Defendants Vitale, Davenport, Erickson, Stein, Johnson, Nwamu, Conway, and Finkelstein are referred to collectively as the "Individual Defendants."

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

20. By reason of their positions as officers, directors, and/or fiduciaries of BellRing and because of their ability to control the business and corporate affairs of BellRing, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BellRing in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of BellRing and its shareholders.

21. Each director and officer of the Company owes to BellRing and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest

obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

22. The Individual Defendants, because of their positions of control and authority as directors and/or officers of BellRing, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of the Company.

23. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

24. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

**THE CODE OF CONDUCT**

25. BellRing's Code of Conduct (the "Code of Conduct"), which applies to the Company's employees, officers, and directors, states that BellRing is committed to maintaining its financial books and records with "the highest degree of accuracy, completeness and integrity." It further states that BellRing maintains accounting and internal-control systems designed to safeguard against loss and ensure that Company records are reliable for preparing financial statements; prohibits fraudulent or false entries; and recognizes that investors rely on those records for "an accurate and transparent view of the Company's condition."

26. The Code of Conduct also prohibits insider trading and "tipping," requires compliance with applicable securities laws and NYSE rules, and establishes an Employee Speak Up Line staffed by an independent third-party provider and available at all times. The Code of Conduct provides that retaliation against a person who in good faith reports an actual or suspected violation or participates in an investigation is strictly prohibited.

**THE AUDIT COMMITTEE CHARTER**

27. BellRing's Audit Committee Charter (the "Audit Committee Charter") charges the Audit Committee with overseeing, among other things, the quality and integrity of BellRing's financial statements and financial reporting; BellRing's compliance with legal and regulatory requirements, codes of conduct, and ethics programs; and BellRing's systems of internal accounting, financial, and disclosure controls.

28. The Audit Committee Charter further requires the Audit Committee to oversee BellRing's enterprise-wide risk-management program; oversee management's development and implementation of risk-assessment, management, mitigation, and reporting policies; review and discuss BellRing's earnings releases and financial information and guidance provided to analysts

and rating agencies; and establish procedures for receiving, retaining, and treating complaints concerning accounting, internal controls, or auditing matters and for employees' confidential, anonymous submission of related concerns.

## SUBSTANTIVE ALLEGATIONS

29. BellRing is a consumer packaged goods company focused on the global convenient-nutrition category. Its principal brands, Premier Protein and Dymatize, compete in product forms that include ready-to-drink ("RTD") protein shakes and protein powders.

30. Premier Protein accounts for approximately 86% of BellRing's revenue, and Premier Protein RTD shakes account for more than 80% of total sales. The performance of Premier Protein and its RTD shakes therefore bears directly on the Company's overall financial performance.

31. BellRing sells its products through several distinct distribution channels: club retailers, principally Costco, Sam's Club, and BJ's; food, drug, and mass-market retailers, including Walmart; e-commerce retailers, principally Amazon; and specialty and convenience retailers. The club-retail channel accounted for more than 50% of BellRing's fiscal 2025 sales, while Walmart accounted for approximately 24% and Amazon approximately 9.7%.

32. Under BellRing's revenue-recognition policy, the Company recognizes revenue when control of its products passes to a retailer. BellRing's reported net sales therefore measure shipments to retailers, while "consumption" measures purchases by end users. BellRing regularly reported both shipments and consumption as key performance indicators and used them to describe the strength and trajectory of its business.

33. BellRing used Numerator and Circana, market research companies, to monitor end-user consumption, market share, consumers' movement between brands, promotional activity, and

competitive trends across the distribution channels in which its products were sold. BellRing incorporated data from one or both services into every investor presentation accompanying its earnings calls from the fourth quarter of fiscal 2023 through the second quarter of fiscal 2026.

34. Numerator provides consumer-purchase data across retail channels, including club, mass-market, grocery, specialty, and e-commerce retailers. It tracks consumer purchasing patterns, market share, competitive dynamics, brand switching, and promotional activity.

35. Circana measures consumer behavior and retail execution through point-of-sale data, panel data, marketing-mix modeling, and related services. Circana's data include market share, promotional intensity, brand switching, category expansion or contraction, and customer churn.

36. On April 10, 2023, Numerator issued a press release announcing that BellRing had selected Numerator as its primary provider to obtain new levels of "consumer visibility and understanding." In that press release, BellRing's Chief Growth Officer, Doug Cornille, explained why the information provided by Numerator was important to BellRing: "Numerator gives us a more holistic view of those consumers, which allows us to identify emerging behaviors and trends - and take decisive action."

37. On May 9, 2023, during BellRing's second-quarter fiscal 2023 earnings call, Defendant Davenport likewise told investors that BellRing used Numerator's information in day-to-day management and forecasting, stating:

> We're understanding purchasing patterns, media habits. And it's helping us in, I would say, 2 specific areas. One is just improved day-to-day management. We're able to forecast more effectively because we understand the interactions with competitors as well as kind of where our growth trajectory is . . . .

38. BellRing subscribed to both Numerator and Circana throughout the relevant period. From the fourth quarter of fiscal 2023 through the second quarter of fiscal 2026, every investor

presentation accompanying BellRing's earnings calls contained charts prepared with data from Circana, Numerator, or both. Through those services and BellRing's own internal information, the Company's senior executives had up-to-date visibility into consumption, market share, competitor activity, promotional volume, ordering trends, and internal forecasts.

***False and Misleading Statements Issued During the Relevant Period***

39. On November 18, 2024, in a press release attached to a Current Report on Form 8-K filed with the SEC, BellRing reported fourth-quarter fiscal 2024 net sales of $555.8 million, a 17.6% increase from the prior-year period, and gross profit of $205.1 million, a 32.1% increase. In that press release, Defendant Davenport stated, "We finished the year strong, with our results coming in at the high end of our expectations. . . . Our momentum remains high as we enter 2025. The convenient nutrition category continues to provide strong tailwinds, with ready-to-drink shakes and powders in the early stages of growth."

40. On November 19, 2024, during BellRing's fourth-quarter and fiscal-year 2024 earnings call, Defendant Davenport emphasized that Premier Protein's growth was based on underlying demand rather than heavy discounting. She called fiscal 2024 "a pivotal year for our largest brand, Premier Protein" because BellRing had "steadily increased our supply" and "demonstrated that the demand is there and will continue to grow as we layer in demand drivers." During the same call, Defendant Davenport described that growth as "truly unique" because BellRing achieved it "without significant advertising or promotion at many retailers," which she said "further illustrat[ed] the brand strength" and "future potential."

41. On November 19, 2024, the Company filed an Annual Report on Form 10-K with the SEC (the "2024 10-K"). Defendant Davenport, Rode, Defendant Vitale, Defendant Conway, Defendant Erickson, Defendant Johnson, Defendant Nwamu, and Defendant Stein signed the 2024

10-K. Defendant Davenport and Rode also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that were filed as exhibits to the 2024 10-K and attested, among other things, to the accuracy of BellRing's disclosures and the effectiveness of its disclosure controls.

42. On February 3, 2025, the Company issued a press release reporting first-quarter fiscal 2025 net sales of $532.9 million, a 23.8% increase from the prior-year period, and gross profit of $199.6 million, a 34.9% increase.

43. On February 4, 2025, during BellRing's first-quarter fiscal 2025 earnings call, Defendant Davenport stated, "Our organization has officially pivoted to demand driving. Strong macro tailwinds around protein are driving robust long-term growth." During the same call, when asked about competition, Defendant Davenport responded that "there aren't a ton of major changes," described the RTD category as "highly complex," and characterized it as having "a much different . . . competitive moat."

44. By the first quarter of fiscal 2025, however, Numerator data available to BellRing showed that Premier Protein's end-user consumption was weakening across several independent measures, including brand shifting, category expansion or contraction, and category churn.

45. Brand shifting refers to consumers moving between competing products. In Premier Protein's core club-retail channel, consisting principally of Costco, Sam's Club, and BJ's, volume attributable to brand shifting was down approximately 1.9% year over year in the first quarter of fiscal 2025. That decline grew to approximately 2.8% in the second quarter, 4.9% in the third quarter, and 8.1% by the end of the year. Comparable downward trends appeared across Premier Protein's other distribution channels, including mass-market, grocery, specialty, and e-commerce retailers.

46. Category expansion or contraction refers to changes in purchasing intensity among

existing consumers. Existing consumers purchased approximately 11.9% more Premier Protein volume year over year in the first quarter of fiscal 2025. That growth slowed to approximately 7.3% in the second quarter and 1.6% in the third quarter, and it turned negative, at approximately -2.1%, by year end.

47. Category churn measures the rate at which new consumers enter and existing consumers leave the category. Purchases by new consumers grew approximately 22.4% year over year in the first quarter of fiscal 2025. That rate fell to approximately 16.6% in the second quarter, 15.9% in the third quarter, and 4.1% by year end. The same downward trend appeared within Premier Protein's club-retail channel.

48. By January 2025, Circana data available to BellRing showed that the percentage of Premier Protein sales occurring on promotion had risen from approximately 19% in December 2024 to approximately 48%. When that percentage declined to approximately 29% in February 2025, sequential sales growth fell approximately 7%, demonstrating the immediate relationship between BellRing's sales and its promotional activity.

49. By March 2025, Circana data available to BellRing showed that approximately 54% of Premier Protein sales occurred on promotion. When the percentage declined to approximately 35% in April 2025, sales fell approximately 24%. Even outside peak months, BellRing's promotions remained materially above the Company's historical levels.

50. Between March 31 and April 27, 2025, Circana data available to BellRing also showed that Premier Protein's sales growth and market share declined sharply, with market share falling nearly five percentage points in the weeks immediately preceding May 6, 2025.

51. On May 6, 2025, during BellRing's second-quarter fiscal 2025 earnings call, analysts questioned whether underlying consumer consumption had weakened. Defendant Davenport

unequivocally denied any weakness, stating:

> There's really no change in consumption. I mean we continue to see strong consumption. Q2 was up 25%, boosted by the New Year, New You, promotions and advertising. As we go into Q3, we're expecting to continue to see strong consumption, saw 16% in April. We expect Q3 to land kind of mid- to high teens, so incredibly strong. . . . But absolutely, no softness, no concern around consumption.

52. On May 6, 2025, during the same earnings call, Defendant Davenport separately represented that BellRing's "consumption remain[s] resilient and strong."

53. On May 6, 2025, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q2 2025 10-Q"). Defendant Davenport and Rode signed SOX certifications filed as exhibits to the Q2 2025 10-Q, attesting, among other things, to the accuracy of the report and their responsibility for establishing and maintaining BellRing's disclosure controls. The Q2 2025 10-Q stated that Premier Protein sales increased $92.3 million, or 22%, "driven by 15% higher volumes primarily due to higher RTD shake production, distribution gains and increased promotional activity." The filing attributed Premier Protein's sales growth to promotional activity without disclosing that the Company's promotional activity had become extraordinary, unsustainable, and materially distortive of reported results.

54. On May 6, 2025, in the Q2 2025 10-Q, BellRing stated that there had been "no material changes" to the risk factors disclosed in the 2024 10-K. BellRing thereby continued to direct investors to warnings concerning, among other things, its ability to compete and retain its market position and its ability to maintain net selling prices and manage promotional activities.

55. Those risk disclosures were materially misleading because they described the relevant risks as potential or hypothetical after BellRing's data showed that competition was already eroding consumption and unusually heavy promotions were already supporting reported sales.

56. On May 6, 2025, in its Second Quarter Fiscal Year 2025 Supplemental Investor

Presentation issued in connection with that day's earnings call, BellRing purported to identify the months in which club promotions occurred but displayed "Club Promotions" only in March 2025. Circana data showed that major promotions also occurred in January and February, and that approximately 48%, 29%, and 54% of Premier Protein sales occurred on promotion in January, February, and March, respectively.

57. By omitting the January and February events, the May 6, 2025 investor presentation materially understated the extent to which promotions supported reported consumption throughout the quarter.

58. The May 6, 2025 assurances were materially false and misleading when made. BellRing's data showed that Premier Protein's consumption was already weakening through brand shifting, category expansion or contraction, and category churn; its market share had fallen sharply in April; new competitors had entered the category; and reported consumption was being supported by promotions far above historical levels.

***The Truth Begins to Emerge***

59. On August 4, 2025, the Company issued a press release reporting its third-quarter fiscal 2025 results, narrowing its fiscal-year net-sales outlook to a range of $2.28 billion to $2.32 billion.

60. On August 5, 2025, during BellRing's third-quarter fiscal 2025 earnings call, Defendant Davenport attributed the reduced outlook to increased competition. During the same call, Defendant Davenport acknowledged that "success attracts competition" and that new protein RTD products had entered the convenient-nutrition category.

61. On August 5, 2025, during the same earnings call, Defendant Davenport admitted that the promotional activity during the preceding quarter was broader than BellRing had previously disclosed. In response to an analyst's question, Defendant Davenport stated that BellRing

had "up-leveled our Q4 club promotions" and that its "biggest promotional period is that January, February, March." In the investor presentation accompanying that earnings call, BellRing likewise showed "Major Club Promotions" in January and February 2025, months that the May presentation had omitted.

62. On August 5, 2025, the Company filed a Quarterly Report on Form 10-Q with the SEC (the "Q3 2025 10-Q"). Defendant Davenport and Rode signed SOX certifications filed as exhibits to the Q3 2025 10-Q, attesting, among other things, to the accuracy of the report and their responsibility for establishing and maintaining BellRing's disclosure controls. The Q3 2025 10-Q stated that Premier Protein sales increased $26.3 million, or 6%, "driven by 3% higher volumes primarily due to distribution gains and incremental promotional activity." The filing omitted that BellRing's promotion-supported short-term volume did not reflect durable consumption and that reducing those promotions would adversely affect later periods.

63. On August 5, 2025, in the Q3 2025 10-Q, BellRing stated that there had been "no material changes" to the risk factors disclosed in the 2024 10-K. BellRing thereby continued to direct investors to warnings concerning, among other things, its ability to compete and retain its market position and its ability to maintain net selling prices and manage promotional activities.

64. Those risk disclosures were materially misleading because BellRing's data showed that the risks had already materialized.

65. On August 5, 2025, on the foregoing disclosures, BellRing's stock price fell $17.46 per share, or nearly 33%, from $53.64 on August 4, 2025 to $36.18 on August 5, 2025, on unusually heavy trading volume.

66. On August 5, 2025, during the same earnings call, Defendant Davenport continued to minimize the breadth and duration of the competition affecting Premier Protein. She

characterized increased competition in the club-retail channel as a "unique" and temporary merchandising situation at one key club retailer, later identified as Costco, and represented that competition in the club-retail channel would "come down a little bit."

67. Those August 5, 2025 statements conflicted with BellRing's contemporaneous Numerator data. By the first quarter of fiscal 2025, Premier Protein volume in the club-retail channel was already declining year over year as consumers shifted to competitors. The rate of decline grew from 1.9% in the first quarter to 2.8% in the second quarter and 4.9% in the third quarter, and the same trend appeared in other distribution channels and was not confined to Costco or any other single retailer.

68. On August 5, 2025, during the same earnings call, Rode told investors that Premier Protein was benefiting from "incremental promotional activity as we return to historical promotional levels." The statement understated BellRing's actual promotion levels. Circana data showed that the percentage of Premier Protein sold on promotion had exceeded 50% in March and reached approximately 57% in August, far above BellRing's historical experience.

69. On November 18, 2025, during BellRing's fourth-quarter and fiscal-year 2025 earnings call, Defendant Davenport acknowledged a "more competitive environment" and announced fiscal-year 2026 net-sales guidance of 4% to 8% growth. During the same call, Defendant Davenport explained that sales were expected to be "modestly below our long-term algorithm" because of a softer first quarter and "near-term competitive dynamics."

70. On November 18, 2025, the Company filed an Annual Report on Form 10-K with the SEC (the "2025 10-K"). Defendant Davenport, Rode, Defendant Vitale, Defendant Conway, Defendant Erickson, Defendant Johnson, Defendant Nwamu, and Defendant Stein signed the 2025 10-K. Defendant Davenport and Rode also signed SOX certifications filed as exhibits to the 2025

10-K, attesting, among other things, to the accuracy of the report and their responsibility for establishing and maintaining BellRing's disclosure controls. The 2025 10-K stated that Premier Protein sales increased $286.3 million, or 17%, "driven by 15% higher volumes primarily due to distribution gains and incremental promotional activity." The filing omitted that the percentage of Premier Protein sold on promotion had risen from approximately 19% in December 2024 to approximately 48% in January 2025, approximately 54% in March 2025, and approximately 57% in August 2025, and that the resulting short-term volume did not reflect durable consumption.

71. On November 18, 2025, in the 2025 10-K, BellRing warned that its results could be affected by risks including its ability to compete and retain its market position and its ability to maintain net selling prices and manage promotional activities. Those warnings were materially misleading because they described risks as potential or hypothetical after competition had already eroded consumption and unusually heavy promotions had already supported reported sales.

72. On November 18, 2025, during the same earnings call, Rode stated that Premier Protein shake consumption was expected to be flat in the first quarter of fiscal 2026 because BellRing had "chose[n] not to repeat promotions for Premier and Dymatize" from the prior-year quarter. Rode explained that the non-repeated promotions and sales pulled forward into the prior period would create a four-percentage-point headwind to first-quarter growth.

73. On November 18, 2025, during the same earnings call, Defendant Davenport emphasized that the category ordinarily used far fewer promotions than BellRing had run during fiscal 2025: "remember that this category is actually fairly low promotion compared to many categories. It's just about 25% to 30% sold on deal."

74. On November 18, 2025, following those disclosures, BellRing's stock traded to an intraday low of $22.45, more than 12% below its November 17 closing price of $25.62, on

unusually heavy trading volume.

75. On November 18, 2025, during the same earnings call, Defendant Davenport attempted to minimize the deterioration. Asked what had changed during the preceding six months, Defendant Davenport responded, "I would actually start with what has not changed," and described the preceding three quarters as having "strong, strong growth." When asked about new entrants during the same call, Defendant Davenport stated that BellRing had a "clear position," that its repeat rates were "only getting stronger," and that BellRing was "sourcing some volume from those competitors."

76. On December 16, 2025, the Company filed a Proxy Statement on Schedule 14A with the SEC (the "2025 Proxy Statement"). The 2025 Proxy Statement solicited stockholder votes to elect or reelect Defendant Vitale, Defendant Finkelstein, Defendant Stein, Defendant Davenport, and Defendant Nwamu and to approve executive compensation.

77. On December 16, 2025, in the 2025 Proxy Statement, BellRing represented that the Board was responsible for risk oversight and carried out that responsibility, directly and through its committees, by "regularly reviewing and discussing with management the risks inherent in the operation of our business and applicable risk mitigation efforts." The 2025 Proxy Statement further stated that management met regularly to discuss the Company's "business strategies, challenges, risks and opportunities" and reviewed those subjects with the Board at regularly scheduled meetings.

78. On December 16, 2025, in the 2025 Proxy Statement, BellRing also represented that the Audit Committee's principal responsibilities included monitoring and overseeing "the quality and integrity of our financial statements and financial reporting," the Company's systems of internal accounting, financial, and disclosure controls, and compliance with legal and regulatory

requirements, codes of conduct, and ethics programs. BellRing further represented that the Company's compensation policies did not "encourage excessive and unnecessary risk-taking" and that BellRing was committed to "creating long-term stockholder value" through strong corporate governance.

79. On December 16, 2025, in the 2025 Proxy Statement, BellRing described executive compensation as "significantly skew[ed] towards performance-based 'at-risk' compensation." Consistent with that description, Defendant Davenport's and Rode's compensation was heavily weighted toward PRSUs tied to BellRing's relative total shareholder return. For fiscal 2024, 66% of Defendant Davenport's compensation and 41% of Rode's compensation consisted of PRSUs; for fiscal 2025, the corresponding figures were 54% and 34%.

80. The representations in the 2025 Proxy Statement were false and misleading and omitted material information. The Board had failed to implement and maintain effective reporting and monitoring systems concerning BellRing's core product and the Company's use of consumption, competitive, market-share, and promotional information; to oversee the material risks arising from those subjects; and to act when BellRing's near real-time data contradicted its public statements. The 2025 Proxy Statement did not disclose those failures or the resulting exposure to securities claims. The compensation disclosures further demonstrate that Defendant Davenport and Rode had significant financial interests in BellRing's stock performance.

81. On February 3, 2026, the Company issued a press release announcing that Defendant Davenport had notified the Board that she would retire as President and CEO upon the earlier of the appointment of a successor or September 30, 2026, followed by an advisory period. BellRing also disclosed in that press release that it had only begun an external search and had not identified a successor.

82. On February 3, 2026, during BellRing's first-quarter fiscal 2026 earnings call, Defendant Davenport announced that the Company had narrowed its fiscal-year net-sales guidance to 4% to 6% growth and attributed the revision to "more frequent promotional events from Insurgent Brands than expected." During the same call, Rode confirmed that BellRing had chosen not to repeat Premier Protein promotions from the prior-year quarter.

83. On February 3, 2026, in a report analyzing the Numerator metrics described above, Morgan Stanley concluded that "trends have been volatile and visibility remains low" and that it was therefore "prudent to model FY26 revenue/EBITDA toward the lower end of management's guidance range." After BellRing reduced promotional activity in the first quarter of fiscal 2026, Premier Protein's market share fell from approximately 25% to approximately 22%, its lowest level since approximately June 2024.

84. On February 3, 2026, following those disclosures, BellRing's stock price fell $3.51 per share, or nearly 14%, from $24.39 on February 2, 2026 to $20.88 on February 3, 2026, on unusually heavy trading volume.

85. On May 5, 2026, during BellRing's second-quarter fiscal 2026 earnings call, Defendant Davenport acknowledged that the Company’s financial results were below expectations and that BellRing had faced a challenging operating environment. Defendant Davenport stated:

> Our second quarter results came in below our expectations, and we are disappointed with our results. We faced a challenging operating environment, as multiple dynamics pressured our financial results. While net sales grew 2%, which was only modestly below expectations, the mix of our revenues differed meaningfully from both our forecast and what we've seen historically.

86. On May 5, 2026, during the same earnings call, Defendant Davenport disclosed the scale and duration of the competition that BellRing had been monitoring internally: "I think our latest estimates were internally somewhere around 40 new competitors over the last 18 months. So it's tremendous. And as the number one player, we are going to get affected by that."

87. On May 5, 2026, during the same earnings call, Defendant Davenport criticized competitors because 27% of RTD-shake category volume was sold on price promotion during the quarter, calling 27% a "big number" and stating that competitors were "not acting very rationally." BellRing's own promotional volume had reached approximately 48% in January 2025, 54% in March 2025, and 57% in August 2025.

88. On this news, BellRing's stock price fell $6.73 per share, or nearly 39%, from $17.36 on May 4, 2026 to $10.63 on May 5, 2026, on unusually heavy trading volume.

***The Securities Class Action Motion to Dismiss Decision***

89. On July 28, 2026, Judge Jed S. Rakoff entered an order granting in part and denying in part the defendants' motion to dismiss the Securities Class Action. The Court dismissed only the claims "premised on alleged misrepresentations regarding retailer demand" but held that the remaining claims, including those based on alleged misrepresentations concerning end-user "consumption," were adequately pleaded and survived dismissal.

***Insider Trading Allegations***

90. Between February 10 and February 24, 2025, while BellRing's data reflected weakening consumption and sharply increased promotions, Defendant Vitale sold 368,334 BellRing shares for proceeds of approximately $28.1 million. BellRing had deferred Defendant Vitale's 2022 and 2023 performance-based restricted stock unit ("PRSU") awards until February 2025, when it awarded him 780,000 shares worth approximately $62 million. Defendant Vitale's sales were as follows:

| Date | Shares | Avg Price | Proceeds | Remaining | % Sold |
|---|---|---|---|---|---|
| Feb. 10 | 5,100 | $75.30 | $384,030 | 1,465,195 | 0.3% |
| Feb. 11 | 28,234 | $75.86 | $2,141,937 | 1,436,961 | 1.9% |
| Feb. 12 | 28,453 | $76.91 | $2,188,320 | 1,408,508 | 2.0% |

| | | | | | |
|---|---|---|---|---|---|
| Feb. 13 | 48,230 | $77.52 | $3,738,790 | 1,360,278 | 3.4% |
| Feb. 14 | 79,068 | $77.04 | $6,091,113 | 1,281,210 | 5.8% |
| Feb. 18 | 44,249 | $77.37 | $3,423,486 | 1,236,961 | 3.5% |
| Feb. 19 | 43,511 | $77.35 | $3,365,576 | 1,193,450 | 3.5% |
| Feb. 20 | 46,766 | $74.72 | $3,494,520 | 1,146,684 | 3.9% |
| Feb. 21 | 15,000 | $73.47 | $1,102,001 | 1,131,684 | 1.3% |
| Feb. 24 | 29,723 | $72.65 | $2,159,362 | 1,101,961 | 2.6% |
| **TOTAL** | **368,334** | **$76.23** | **$28,089,135** | **1,101,961** | **25.1%** |

91. On February 26, 2025, Defendant Davenport adopted a Rule 10b5-1 trading plan. By that date, BellRing's data already reflected weakening consumption, increased competition, and elevated promotions.

92. Between May 30 and August 1, 2025, Defendant Davenport sold 16,000 BellRing shares for approximately $931,065 pursuant to the Rule 10b5-1 trading plan she adopted on February 26, 2025. Her August 1 sale occurred shortly before BellRing's August 5 disclosures concerning increased competition and previously undisclosed promotional activity.

## DAMAGES TO BELLRING

93. As a direct and proximate result of the Individual Defendants' misconduct, BellRing has suffered and will continue to suffer substantial harm, including losses associated with the decline in its market capitalization, exposure to liability in the Securities Class Action, and damage to its reputation and goodwill.

94. BellRing has incurred and will continue to incur substantial costs associated with defending the Securities Class Action and conducting any related internal investigations, including fees paid to attorneys, accountants, and other professionals.

95. BellRing has also paid compensation and other benefits to Individual Defendants

who breached their fiduciary duties and has been deprived of the profits obtained by the Insider Seller Defendants through the challenged stock sales.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

96. Plaintiff brings this action derivatively and for the benefit of BellRing to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of fiduciary duty, violations of federal securities laws, and other misconduct.

97. BellRing is named solely as a nominal party. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

98. Plaintiff is, and has been at all relevant times, a BellRing stockholder and was a stockholder when the misconduct alleged herein occurred. Plaintiff will adequately and fairly represent BellRing's interests in enforcing and prosecuting its rights and has retained counsel experienced in derivative litigation.

99. Plaintiff has not made a demand on the Board to institute this action because such a demand would be futile. As of the date of this Complaint, the Board consists of eight directors: Defendant Vitale, Defendant Erickson, Defendant Stein, Defendant Johnson, Defendant Nwamu, Defendant Conway, Defendant Finkelstein, and Michael Axelrod (the "Current Board"). Defendant Davenport resigned from the Board on July 29, 2026, when Axelrod became BellRing's President and Chief Executive Officer and joined the Board. Defendant Stein has tendered his resignation effective September 30, 2026 but remains a director as of the date of this Complaint. Seven of the Current Board's eight members are defendants in this action and face a substantial likelihood of liability or lack independence from other interested directors.

100. Defendant Vitale is not independent. BellRing's 2025 Proxy Statement did not identify him as an independent director. He serves simultaneously as BellRing's Chairman and as

President, Chief Executive Officer, and Chairman of Post Holdings, BellRing's former parent. BellRing's 2025 Form 10-K identifies conflicting interests, or the appearance of conflicting interests, arising from certain BellRing directors also serving as Post officers or directors as a material risk. At BellRing's January 29, 2026 annual meeting, Defendant Vitale received approximately 74% support for reelection, compared with approximately 95% to 99% for the other nominees.

101. Defendant Vitale authorized the 2025 Proxy Statement containing the false and misleading statements and omissions alleged herein and benefited from the Section 14(a) violation by securing his reelection. He also sold 368,334 BellRing shares for proceeds of approximately $28.1 million while allegedly possessing material adverse nonpublic information, receiving a material personal benefit not shared with other stockholders.

102. Defendant Vitale failed to implement and maintain effective controls over BellRing's disclosures concerning its core operations, effectively oversee the material risks facing BellRing, and investigate and respond to red flags concerning consumption, competition, promotional activity, and internal controls. He therefore faces a substantial likelihood of liability and cannot impartially consider a demand.

103. Defendant Erickson was selected for BellRing's Board in October 2019 through a Post Holdings-controlled nomination process when Post held approximately 71% of BellRing's outstanding equity. Defendant Erickson and Defendant Vitale are also both former KPMG LLP professionals with longstanding ties to the St. Louis business community. Defendant Erickson's Board position and the substantial compensation he receives from BellRing further impair his ability to consider a demand against the directors who influence his continued tenure.

104. Defendant Erickson authorized the 2025 Proxy Statement containing the false and misleading statements and omissions alleged herein. As Chair of the Audit Committee, a member

of the Corporate Governance and Compensation Committee, and Lead Independent Director, he had particular responsibility for BellRing's risk oversight, legal compliance, financial reporting, disclosure controls, governance policies, and financial guidance and failed to perform those duties.

105. Defendant Erickson failed to implement and maintain effective controls, oversee BellRing's material risks, and investigate and respond to red flags concerning the misconduct alleged herein. He faces a substantial likelihood of liability and cannot impartially consider a demand.

106. Defendant Stein was selected for BellRing's Board through the Post Holdings-controlled nomination process and has served since BellRing's October 2019 initial public offering, when Post held approximately 71% of BellRing's equity. He served as Lead Independent Director until July 2025 and is a member of the Audit Committee. Although he tendered his resignation effective September 30, 2026, he remains a director as of the date of this Complaint.

107. Defendant Stein authorized the 2025 Proxy Statement containing the false and misleading statements and omissions alleged herein and benefited from the alleged Section 14(a) violation by securing his reelection. As an Audit Committee member, he had particular responsibility for risk oversight, legal compliance, the integrity of BellRing's financial reporting, and review of earnings releases and guidance.

108. Defendant Stein failed to implement and maintain effective controls, oversee BellRing's material risks, and investigate and respond to red flags concerning the misconduct alleged herein. He faces a substantial likelihood of liability and cannot impartially consider a demand.

109. Defendant Johnson simultaneously serves on the boards of BellRing, Post Holdings, and Post Holdings Partnering Corporation. Post appointed her to its board in May 2021, when Post still held a majority interest in BellRing. She also serves on BellRing's Corporate Governance

and Compensation Committee while serving alongside Defendant Vitale, Post's Chief Executive Officer and Chairman, on Post's board. These overlapping relationships impair her ability to consider a demand adverse to Defendant Vitale and the other Individual Defendants.

110. Defendant Johnson authorized the 2025 Proxy Statement containing the false and misleading statements and omissions alleged herein. As a member of the Corporate Governance and Compensation Committee, she had responsibility for BellRing's governance policies and executive-compensation practices and failed to fulfill those duties.

111. Defendant Johnson failed to implement and maintain effective controls, oversee BellRing's material risks, and investigate and respond to red flags concerning the misconduct alleged herein. She faces a substantial likelihood of liability and cannot impartially consider a demand.

112. Defendant Nwamu was appointed to BellRing's Board in May 2021, while Post Holdings still held a majority interest in BellRing and controlled the director-nomination process. She authorized the 2025 Proxy Statement containing the false and misleading statements and omissions alleged herein and benefited from the alleged Section 14(a) violation by securing her reelection.

113. As an Audit Committee member, Defendant Nwamu had particular responsibility for risk oversight, legal compliance, the integrity of BellRing's financial reporting, and review of earnings releases and guidance. She failed to implement and maintain effective controls, oversee BellRing's material risks, and investigate and respond to red flags concerning the misconduct alleged herein. She faces a substantial likelihood of liability and cannot impartially consider a demand.

114. Defendant Conway has received substantial compensation from BellRing,

including $260,000 in fiscal 2024 and $283,750 in fiscal 2025, and his continued Board service depends on the directors against whom the claims would be asserted. He authorized the 2025 Proxy Statement containing the false and misleading statements and omissions alleged herein.

115. As Chair of the Corporate Governance and Compensation Committee, Defendant Conway had particular responsibility for BellRing's governance policies, executive-compensation practices, and committee structure. He failed to implement and maintain effective controls, oversee BellRing's material risks, and investigate and respond to red flags concerning the misconduct alleged herein. He faces a substantial likelihood of liability and cannot impartially consider a demand.

116. Defendant Finkelstein joined the Board on January 1, 2026 after being selected by the directors against whom the claims asserted herein would be pursued. He was elected through the 2025 Proxy Statement and benefited from the alleged Section 14(a) violation by securing his Board position.

117. Defendant Finkelstein's independence is further impaired by his institutional ties to BellRing and Post Holdings. While he led Consumer and Retail Mergers and Acquisitions at Citigroup, Citigroup served as a lead bookrunning manager for BellRing's October 2019 initial public offering, a joint lead book-runner for Post's August 2022 debt-for-equity exchange of BellRing stock, and an additional book-runner for Post's November 2022 offering of its remaining BellRing shares.

118. As an Audit Committee member, Defendant Finkelstein has responsibility for BellRing's risk oversight, legal compliance, financial reporting, and review of earnings releases and guidance. His selection by the interested Board, the challenged proxy solicitation through which he was elected, and his institutional ties prevent him from impartially considering a demand.

119. The Current Board remains substantially connected to Post Holdings, BellRing's former parent. Post took BellRing public in October 2019 while retaining approximately 71% of BellRing's outstanding equity. Defendant Vitale simultaneously serves as BellRing's Chairman and as Post's President, Chief Executive Officer, and Chairman, and Defendant Johnson simultaneously serves on the boards of BellRing, Post, and a Post-affiliated entity.

120. Six of the seven defendant directors now serving on the Current Board—Defendants Vitale, Erickson, Stein, Johnson, Nwamu, and Conway—were selected while Post Holdings or its appointees exercised substantial influence over BellRing's Board. Defendant Finkelstein was later selected by the same Board whose conduct is challenged in this action. A demand would therefore require a majority of the Current Board to authorize claims against themselves, their close colleagues, and Defendant Vitale, with whom several directors have substantial ties.

121. BellRing has suffered and will continue to suffer substantial losses from the wrongdoing alleged herein, yet the Board has not caused the Company to pursue recovery from the Individual Defendants. The defendant directors also received substantial compensation and other benefits through their Board service.

122. Public companies such as BellRing typically maintain directors' and officers' liability insurance from which the Company might recover some of its losses. Such policies may contain insured-versus-insured exclusions or other limitations affecting claims voluntarily instituted by the insured directors against themselves. The Board has not pursued recovery of BellRing's alleged damages from the Individual Defendants or any available insurance.

**COUNT I**

***Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder***

123. Plaintiff incorporates by reference and realleges each allegation set forth above as

though fully set forth herein.

124. The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim does not allege and does not sound in fraud. Plaintiff specifically disclaims reliance on any allegation of fraud, scienter, or recklessness with regard to this claim.

125. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that it is unlawful for any person, through the use of the mails, interstate commerce, or a national securities exchange, to solicit or permit the use of his or her name to solicit a proxy in contravention of rules prescribed by the SEC for the protection of investors.

126. Rule 14a-9, promulgated pursuant to Section 14(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

127. The 2025 Proxy Statement was materially false and misleading because the Individual Defendants were required, but failed, to implement and maintain effective controls over BellRing's disclosures concerning its core operations; effectively oversee and monitor the material risks facing the Company; and investigate and take action when presented with red flags concerning consumption, competition, promotional activity, misconduct, or the lack of internal controls. The 2025 Proxy Statement also contained false and misleading statements concerning risk and corporate-governance oversight by the Board and Audit Committee and BellRing's commitment to sound corporate-governance practices.

128. The misleading information in the 2025 Proxy Statement was material to BellRing

stockholders in determining whether to elect or reelect Defendants Vitale, Finkelstein, Stein, Davenport, and Nwamu and whether to approve executive compensation.

129. The material misstatements and omissions in the 2025 Proxy Statement damaged BellRing.

130. Plaintiff, on behalf of BellRing, seeks relief for damages inflicted on the Company by the misleading 2025 Proxy Statement in connection with the election or reelection of Defendants Vitale, Finkelstein, Stein, Davenport, and Nwamu and the approval of executive compensation.

**COUNT II**

***Against the Individual Defendants for Contribution Under Section 21D of the Exchange Act***

131. Plaintiff incorporates by reference and realleges each allegation set forth above as though fully set forth herein.

132. The conduct of the Individual Defendants, as described herein, has exposed BellRing to significant liability under the federal securities laws.

133. BellRing is named as a defendant in the Securities Class Action, which asserts claims arising under the federal securities laws. BellRing is alleged to be liable to private persons, entities, and a class by virtue of many of the same facts alleged herein. If BellRing is found liable for violating the federal securities laws, its liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of some or all of the Individual Defendants, who caused BellRing to suffer substantial harm through their misconduct. BellRing is entitled to contribution from the Individual Defendants in connection with claims asserted against the Company by virtue of their wrongdoing.

134. As officers and directors, the Individual Defendants had the power or ability to

control or influence, directly or indirectly, BellRing's general affairs, including the content of its public statements, and the specific corporate statements and conduct that violated the federal securities laws.

135. The Individual Defendants are liable under Section 21D of the Exchange Act, which governs the application of private rights of action for contribution asserted under the federal securities laws.

136. The Individual Defendants damaged BellRing and are liable to the Company for contribution.

**COUNT III**

***Against the Individual Defendants for Breach of Fiduciary Duties***

137. Plaintiff incorporates by reference and realleges each allegation set forth above as though fully set forth herein.

138. The Individual Defendants owed and owe fiduciary duties to BellRing. By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe BellRing the highest obligations of good faith and loyalty in the administration of BellRing's affairs. The Board also had specific duties under BellRing's corporate-governance documents that, if discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm alleged herein.

139. The Individual Defendants ignored their obligations under state and federal law and failed to make a good-faith effort to correct the problems alleged herein or prevent their occurrence.

140. The Individual Defendants breached their fiduciary duties by failing to implement and maintain effective controls over BellRing's disclosures concerning its core operations; failing to oversee and monitor the material risks facing the Company; failing to investigate and respond

to red flags; and making, authorizing, or permitting false and misleading public statements and regulatory filings.

141. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of BellRing's affairs and the use and preservation of its assets.

142. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, BellRing has sustained significant monetary and reputational damages, including the costs of defending and resolving the Securities Class Action.

143. As a result of the misconduct alleged herein, the Individual Defendants are liable to BellRing.

**COUNT IV**

***Against Defendants Vitale and Davenport for Insider Trading***

144. Plaintiff incorporates by reference and realleges each allegation set forth above as though fully set forth herein.

145. Defendants Vitale and Davenport sold BellRing stock while in possession of material nonpublic information that artificially inflated BellRing's stock price.

146. By selling BellRing stock while possessing material adverse nonpublic information, Defendants Vitale and Davenport exploited their positions at BellRing and breached their fiduciary duties. They improperly benefited from those breaches and are liable to BellRing for the benefits obtained.

147. Plaintiff, on behalf of BellRing, has no adequate remedy at law.

**COUNT V**

***Against the Individual Defendants for Aiding and Abetting Breaches of Fiduciary Duty***

148. Plaintiff incorporates by reference and realleges each allegation set forth above as

though fully set forth herein.

149. Each Individual Defendant acted with knowledge of, or with reckless or grossly negligent disregard for, the fact that the Individual Defendants were breaching their duties to Bell-Ring and participated in those breaches.

150. In committing the wrongful acts alleged herein, each Individual Defendant pursued or joined in a common course of conduct. In addition to pursuing the conduct giving rise to their primary liability, the Individual Defendants aided and abetted or assisted one another in breaching their respective duties.

151. Because the actions described herein occurred under the Board's supervision and authority, each Individual Defendant played a direct, necessary, and substantial part in the common course of conduct alleged herein.

152. Each Individual Defendant aided and abetted the others and rendered substantial assistance in the wrongs alleged herein.

**COUNT VI**

***Against the Individual Defendants for Unjust Enrichment***

153. Plaintiff incorporates by reference and realleges each allegation set forth above as though fully set forth herein.

154. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at BellRing's expense and to its detriment through compensation, director remuneration, and proceeds received as a result of their misstatements and material omissions while breaching fiduciary duties owed to BellRing.

155. The Insider Seller Defendants sold BellRing stock while in possession of material nonpublic information that artificially inflated BellRing's stock price. As a result, the Insider Seller Defendants profited from their misconduct and were unjustly enriched through their exploitation

of material adverse inside information.

156. Plaintiff, as a stockholder and representative of BellRing, seeks on behalf of the Company an order requiring the Insider Seller Defendants to disgorge and furnish restitution to BellRing of all profits, benefits, and other compensation obtained through their wrongful conduct and fiduciary breaches.

157. Plaintiff, on behalf of BellRing, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of BellRing, demands judgment against the Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of BellRing and is an adequate representative of the Company;

B. Declaring that the Individual Defendants breached and/or aided and abetted breaches of fiduciary duties owed to BellRing;

C. Declaring that the Individual Defendants violated Sections 14(a) and 21D of the Exchange Act;

D. Awarding BellRing the damages it sustained as a result of the Individual Defendants' violations, jointly and severally, together with pre- and post-judgment interest;

E. Directing the Individual Defendants to account for all damages sustained and profits obtained through their wrongful conduct;

F. Directing BellRing and the Individual Defendants to reform and improve the Company's compliance systems, internal controls, and corporate governance practices;

G. Awarding BellRing restitution and disgorgement of all profits, benefits, compensation, and insider-trading proceeds obtained by the Individual Defendants;

H. Directing the Individual Defendants to contribute to or reimburse BellRing for liability or damages incurred in connection with the Securities Class Action;

I. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees and expenses; and

J. Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2026

Respectfully submitted,

**FARNAN LLP**

By: *_/s/ Michael J. Farnan_*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, New York 10118
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com